IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| MARY ELIZABETH HARRISON, | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) 2:14-cv-00719-TFM |
| | ) |
| CAROLYN W. COLVIN, | ) |
| ACTING COMMISSIONER OF | ) |
| SOCIAL SECURITY, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

October 14, 2014

**I.  INTRODUCTION**

Mary Elizabeth Harrison ("Plaintiff") brought this action under 42 U.S.C. § 405(g) for judicial review of the decision of the Commissioner of Social Security ("Commissioner"), which denied her application for supplemental security income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 1381 *et seq.* The parties have filed cross-motions for summary judgment, which have been fully briefed and are ripe for disposition. (ECF Nos. 8-11). For the following reasons, the Commissioner's motion will be **GRANTED**, and Plaintiff's motion will be **DENIED**.

**II.  BACKGROUND**

Plaintiff filed for SSI on December 10, 2012, alleging that she has been disabled since October 13, 2012, due to a number of physical and mental impairments.[1] (R. 183). As of the date of the hearing, Plaintiff was a 42-year-old high school graduate who previously worked as a grocery store bagger. (R. 37). However, she stopped working in 2006 because of transportation

---

1.  The ALJ's decision, however, primarily focused on Plaintiff's alleged mental impairments and her obesity. So, too, do Plaintiff's arguments in support of her motion for summary judgment. Accordingly, the Court will do the same.

1

issues and has not worked since. (R. 312).

Plaintiff has a history of depression and anxiety that predates her alleged onset date. She has been prescribed a number of different anti-depressants and anti-anxiety drugs from a psychiatrist at Wesley Spectrum Services, where she received care for some time prior to filing for SSI. (R. 235, 287, 291). Plaintiff testified that she believes that her depression precludes her from working, as she is afraid that she'll "have a breakdown" while on the job. (R. 42). She testified that when she has a "breakdown," she cries a lot and isolates herself. (R. 43). Plaintiff is also morbidly obese and has difficulty standing and walking for long periods of time because she has "trouble with [her] ankles." (R. 40, 235). Nevertheless, she testified that she does all of the housework, laundry, and grocery shopping for herself and her boyfriend, with whom she has lived on-and-off during the past several years, and she also testified that she has no issues taking care of herself. (R. 38). Moreover, she testified that she likes to crochet, go shopping, visit with friends, and play with her pet dog. (R. 42).

Plaintiff's SSI claim was precipitated by a serious "breakdown" on October 12, 2012. (R. 287). She had a bad breakup with her boyfriend, with whom she was living at the time (and with whom she continued to live after the two apparently reunited). (R. 43). After the incident, she "was to the point where [she] was about ready to cut [her] wrist," so she called 911. (R. 43). She was initially taken to Westmoreland Hospital, but the next day, she was voluntarily admitted to Washington Hospital. (R. 43). On admission, Plaintiff said that she still felt suicidal, her affect was restricted, and her insight and judgment appeared to be poor. (R. 289). She was also concerned about what her living situation would be after she left the hospital since she did not believe that she could move back in with her erstwhile boyfriend. (R. 289). However, her speech was fluent and articulate; she was well-oriented to person, place, time, and situation; and she was

not delusional. (R. 289). Plaintiff was diagnosed with major depressive disorder, which was described as "severe without any psychotic features" but with suicidal thoughts. (R. 290). In addition, she was assessed with a global assessment of functioning ("GAF") score of 25. (R. 290). During Plaintiff's hospitalization, her dosages of Buspar (an anti-depressant) and Citalopram (an anti-anxiety medication) were increased, and within 48 hours, doctors reported that she "was brighter[,] not suicidal, had no thoughts to harm herself, and began to look better with regard to hygiene." (R. 287). Plaintiff was discharged on October 18, and by then, her condition had "[g]realty improved," though she was still assessed a GAF score of 45, which is indicative of serious symptoms or "serious impairment in social, occupation, or school functioning." *DSM-IV*, at 34 (4th ed. 2000). Because of the issues with her boyfriend, arrangements were made for her to stay in a shelter until more permanent housing could be found. (R. 287-88).

After her hospitalization, Plaintiff continued to see a psychiatrist at Wesley Spectrum for routine medication management. (R. 323-33). In January, Plaintiff's psychiatrist, Dr. Kira Kirvy, noted that Plaintiff's mood had been down, though she denied having suicidal thoughts. (R. 333). Later that month, Dr. Krivy completed a Medical Source Statement on behalf of Plaintiff. (R. 300). Dr. Krivy opined that Plaintiff's ability to understand, remember, and carry out instructions was not affected by her impairments. (R. 300). Nor was Plaintiff's ability to interact appropriately with supervisors, co-workers, and the public and to respond to changes in the routine work setting so affected. (R. 300). Dr. Krivy did, however, note that Plaintiff had "difficulty handling stressful situations and making decisions" and had "required psychiatric

3

hospitalization after stressful life events, most recently in late 2012."[2] (R. 301). In addition, she noted that Plaintiff "struggled with anxiety related to making decisions about making changes in her life." (R. 301).

The next month, Plaintiff underwent a consultative mental health exam with Dr. Joel Last at the request of the state agency. (R. 312-18). Like the other doctors with whom Plaintiff had treated, Dr. Last diagnosed Plaintiff with major depression, which he noted was "recurrent, moderate, [and] appears to be in remission." (R. 313). He also concluded that Plaintiff had personality disorder and assessed a current GAF score of 45, with a past year high of 45. (R. 313).

In the months that followed, Plaintiff made steady progress, as she began to experience fewer depressive episodes and anxiety attacks. (R. 330, 331, 332). By March, she was reporting to Dr. Krivy that she "ha[d] seen much improvement in anxiety and mood since starting [to take Effexor (an anti-depressant)]" in February. (R. 331). She also consistently denied having suicidal thoughts. (R. 330, 331, 332). In June 2013, Plaintiff began seeing a new psychiatrist, Dr. Robert Algaier, who remarked in the notes from his initial appointment with Plaintiff that she "report[ed] feeling better." (R. 326). In particular, she "rate[d] her depression as an average of 6, which seems to be mostly associated with situations and not constant in her life and her anxiety "as an average of 4." (R. 326). Moreover, she told Dr. Algaier that she felt her medications were helpful. (R. 326).

In addition to the routine medication management appointments, Plaintiff testified that she also attended therapy sessions four days a week: individual therapy once a week at Wesley Spectrum and some form of group therapy three times a week at a facility called Westmoreland

---

2. Although Dr. Krivy's statement may be read to suggest that Plaintiff had required more than one hospitalization, there is no evidence in the record to that effect.

4

Psych Rehab, where, according to her testimony, she had been going for "maybe four or five years." (R. 41, 45, 48). There is nothing in the record from Westmoreland Psych Rehab to confirm Plaintiff's treatment there (and as will be discussed later, Plaintiff submits that the ALJ is to blame for this purported gap in the record and that the matter should be remanded so that the record can be further developed). Records from Wesley Spectrum do, however, make reference to "Psych Rehab" at various points and confirm that Plaintiff "had been attending regular outpatient sessions and weekly group therapy for a long time."[3] (R. 324, 325).

Plaintiff also met weekly with an individual named Mr. Unkefer,[4] whom the ALJ referred to as a "peer specialist" in his decision.[5] (R. 44). Plaintiff testified that she was connected to Mr. Unkefer through Westmoreland Psych Rehab. (R. 43-45). As Plaintiff points out, though, it is not clear from the record what Mr. Unkefer's actual title is (more on this later, too). Plaintiff testified that Mr. Unkefer helped her with activities of daily living (e.g., paying bills, managing money, driving her to appointments, and assisting with grocery shopping)[6] and also helped her with socializing and learning different ways to deal with her depression. (R. 44-45).

Plaintiff's claim was denied at the initial level of review, so she requested a hearing,

---

3. The records from Plaintiff's individual therapy sessions at Wesley Spectrum also note that Plaintiff went to a facility called Westplace on a weekly basis, in addition to going to "Psych Rehab twice per week." (R. 329). Plaintiff did not mention Westplace in her testimony, and it is not clear how the sessions there differed from those at Westmoreland Psych Rehab or Wesley Spectrum.

4. The record does not reveal Mr. Unkefer's first name, and his last name is spelled phonetically in the hearing transcript. (R. 43). The parties and the ALJ adopted the spelling used in the transcript, and the Court will do the same.

5. A "peer specialist" is an individual who also has a history of receiving mental health services, but who is available "to talk, solve problems, and help" another individual suffering from mental health problems. Pl.'s Br. at 11, ECF No. 9 (citation omitted).

6. When asked if she could manage these activities on her own, Plaintiff said, "Yes." (R. 44). When pressed, however, she admitted that Mr. Unkefer would "[p]robably not" agree if he was asked the same question. (R. 44).

which was held before Administrative Law Judge ("ALJ") Charles Pankow in November 2013. Plaintiff was represented by counsel and testified at the hearing, as did a vocational expert ("VE"). (R. 33). Mr. Unkefer was also present at the hearing, but he did not testify. (R. 43). On December 17, 2013, the ALJ issued an unfavorable decision to Plaintiff. (R. 29). In his decision, the ALJ found that although Plaintiff has a number of severe impairments (major depressive disorder, personality disorder, severe obesity, depression, and anxiety), she could still perform light, unskilled work with occasional postural maneuvers in a low stress environment and with only occasional social interaction. (R. 21, 24). Then, relying on the testimony of the VE, the ALJ concluded that a significant number of jobs existed in the national economy that Plaintiff could perform even with those limitations: inspector hand packer, electrical equipment inspector, and jewelry stinger. (R. 28). Therefore, the ALJ found at Step 5 of the sequential evaluation that Plaintiff is not disabled as that term is defined in the Act. (R. 29).

After the Appeals Council upheld the ALJ's decision, Plaintiff filed a Complaint in this Court. The parties' cross-motions for summary judgment followed soon thereafter. In her motion, Plaintiff contends that the ALJ made two errors that require this Court to either award benefits or remand the case to the ALJ for further proceedings. First, she argues that the ALJ failed to sufficiently develop the record because he never sought records from Plaintiff's therapy sessions with Westmoreland Psych Rehab or inquired about the specific nature of the services provided by Mr. Unkefer or determined what his actual title is. Second, she argues that the ALJ erred in failing to address her GAF scores of 45 in his decision, the first of which was assessed in October 2012 following her discharge from Washington Hospital and the second of which was assessed in February 2013 by Dr. Last. For her part, the Commissioner contends that the ALJ's decision should not be disturbed since it is supported by substantial evidence.

## III. STANDARD OF REVIEW

To be eligible for social security benefits, a claimant must demonstrate that she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment that can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler*, 786 F. 2d 581, 583 (3d Cir. 1986). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920. Specifically, the Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003). If the claimant is unable to resume previous employment, the burden shifts to the Commissioner to prove that, given the claimant's mental or physical limitations, age, education, and work experience, she can still perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F. 2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g), 1383(c)(3); *Sweeney v. Comm'r of Soc. Sec.*, 847 F. Supp. 2d 797, 800 (W.D. Pa. 2012) (citing *Schaudeck v. Comm'r of Soc. Sec.*, 181 F. 3d 429, 431 (3d Cir. 1999)). Section 405(g) permits a district court to review the

transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. §706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Gaddis v. Comm'r of Soc. Sec.*, 417 F. App'x 106, 107 n. 3 (3d Cir. 2011) (citing *Burns v. Barnhart,* 312 F. 3d 113, 118 (3d Cir. 2002)).

Substantial evidence is defined as "'more than a mere scintilla'; it means 'such relevant evidence as a reasonable mind might accept as adequate'" to support a conclusion. *Hagans v. Comm'r of Soc. Sec.*, 694 F. 3d 287, 292 (3d Cir. 2012) (quoting *Plummer v. Apfel*, 186 F. 3d 422, 427 (3d Cir. 1999)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. *Id.* (citing *Fargnoli v. Massanari*, 247 F. 3d 34, 38 (3d Cir. 2001)); 42 U.S.C. § 405(g). When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Gamret v. Colvin*, 2014 WL 109089 at *1 (W.D. Pa. Jan. 10, 2014) (citing *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947)). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196-97. Further, even where this court acting *de novo* might have reached a different conclusion, "so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Albert Einstein Med. Cntr. v. Sebelius*, 566 F. 3d 368, 373 (3d Cir. 2009) (quoting *Monsour Med. Cntr. v. Heckler*, 806 F. 2d 1185, 1191 (3d Cir. 1986)).

## IV. DISCUSSION

Plaintiff first argues that the ALJ was derelict in his duty to adequately develop the administrative record. Because of the non-adversarial nature of social security proceedings, an ALJ has "a duty to develop a full and fair record" by attempting to secure all of the information relevant to deciding the claimant's claim. *Ventura v. Shalala*, 55 F.3d 900, 902 (3d Cir. 1995) (citations omitted). This is true even if the claimant is represented by counsel at the hearing, though in such cases the duty is somewhat lessened. *See Rutherford v. Barnhart*, 399 F.3d 546, 557 (3d Cir. 2005); *Boone v. Barnhart*, 353 F.3d 203, 208 n.11 (3d Cir. 2004) (citations omitted); *Dobrowolsky v. Califano*, 606 F.2d 403, 407 (3d Cir. 1979) (noting that an ALJ must "assume a more active role when the claimant is unrepresented"). Specifically, whenever a claimant is represented, an ALJ can assume that the claimant, through her counsel, "is making the strongest case possible for benefits." *Colavito v. Apfel*, 75 F. Supp. 2d 385, 399 n.21 (E.D. Pa. 1999). The onus is therefore on counsel to ensure that the ALJ is aware of all of the evidence favorable to a claimant's case and to probe all of the relevant issues. *Turby v. Barnhart*, 54 F. App'x 118, 122-23 (3d Cir. 2002) (citations omitted). In keeping with that principle, a case should generally not be remanded for further development of the record if a claimant's attorney "affirmatively submits to the ALJ that the record is complete" and the case is ripe for disposition. *Maes v. Astrue*, 522 F.3d 1093, 1098 (10th Cir. 2008).

In this case, Plaintiff is correct that the ALJ never requested records from Westmoreland Psych Rehab, where she apparently attended some type of group therapy up to three days a week for an unspecified period of time. It is also true that the ALJ should have been on notice of the possible existence of these records because Plaintiff listed Westmoreland Psych Rehab as one of her health care providers in her application materials and testified about her group therapy during

the administrative hearing (albeit in a limited fashion).[7] (R. 41, 45, 188). That said, Plaintiff was represented by counsel at the hearing, and at no point did Plaintiff's counsel alert the ALJ of the potential importance of any records from Westmoreland Psych Rehab (assuming that such records even exist) or have Plaintiff fully explain the distinction between the type of therapy she received at Westmoreland Psych Rehab and that which she received at Wesley Spectrum. In fact, when asked at the start of the hearing whether additional records would be forthcoming, counsel responded, "we expect no additional medical [records], so the record can close." (R. 36). Later in his colloquy with the ALJ, Plaintiff's counsel again confirmed that the record did not need to be supplemented. (R. 36). On balance, therefore, the Court cannot conclude that the ALJ failed to adequately develop the record. If there was something missing from the record, Plaintiff's counsel had a duty to bring it to the ALJ's attention. The Court will not permit Plaintiff, through her counsel, to "rest on the record" only to "later fault the ALJ for not performing a more exhaustive investigation. To do so would contravene the principle that the ALJ is not required to act as the claimant's advocate in order to meet his duty to develop the record." *Maes*, 522 F.3d at 1098 (citations omitted).

Likewise, the ALJ was not mandated to solicit additional information about the services provided to Plaintiff by Mr. Unkefer or to determine whether Mr. Unkefer was truly a "peer specialist," as the ALJ referred to him. For starters, Plaintiff has failed to sufficiently explain why it matters whether Mr. Unkefer was a "peer specialist" as opposed to some sort of

---

7. The Court notes, however, that the address listed for Westmoreland Psych in Plaintiff's initial paperwork is incomplete and the phone number listed actually belongs to the attorney who represented Plaintiff at the administrative level. (R. 189-90).

"professional services provider."[8] In the Court's view, it was the nature of the assistance provided by Mr. Unkefer, as described by Plaintiff in her testimony, and not the title of the person providing the assistance, that was relevant to deciding whether Plaintiff could still work despite her impairments. The ALJ acknowledged as much in his decision, noting that Plaintiff required Mr. Unkefer's help in order to maintain her activities of daily living. (R. 22). At any rate, assuming that the distinction between "peer specialist" and "professional service provider" could somehow be relevant, the Court will not fault the ALJ for failing to focus on it. Mr. Unkefer was actually present at the hearing, and Plaintiff's counsel expressly questioned Plaintiff about his role in her life. If the distinction was relevant to the ALJ's decision, then counsel should have made that point clear on the record by specifically asking Plaintiff follow-up questions about Mr. Unkefer or even calling Mr. Unkefer to testify, which could have easily been done as he was present at the hearing. Again, the ALJ was not required to do counsel's job for

---

8. One would think that if the distinction was as important as Plaintiff attempts to make it seem, she would have confirmed that the ALJ got Mr. Unkefer's title wrong (or confirmed his first name and the proper spelling of his last name). But she hasn't done that. Instead, she suggests that rather than being a "peer specialist," Mr. Unkefer could have possibly been some type of "professional service provider," perhaps assisting Plaintiff as part of a "personal care home support program." Pl.'s Br. at 11, ECF No. 9. However, nothing in the record indicates that Plaintiff ever spent time in a personal care home, though. Thus, it is unclear how she could have been eligible to receive services from a "personal care home support program," which according to Plaintiff's own definition, provides "[s]ervices *delivered to personal care homes*." *Id.* (citation omitted) (emphasis added). That has apparently escaped Plaintiff. In fact, later in her brief, Plaintiff makes reference to a "personal care support aide," conveniently omitting the word "home." Nevertheless, it seems apparent that Mr. Unkefer was, in fact, a "peer specialist." Even though that was never made crystal clear on the record, the ALJ is experienced in dealing with claimants with mental health issues, some of whom certainly have received the same type of assistance received by Plaintiff and even appeared at their hearings with their "peer specialists." In the Court's view, that experience enabled him to make a reasonable inference about the nature of the relationship between Plaintiff and Mr. Unkefer. While the ALJ perhaps should have confirmed that before drafting his decision, it would be inappropriate to remand simply to allow him to so. *See Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.").

him.

Finally, as for Plaintiff's contention that the ALJ erred in failing to address her GAF scores, the Court is not persuaded that this warrants a remand. In general, a claimant's GAF scores should be considered along with other evidence in the record, and, as is the case with all of the other types of evidence that make up the administrative record, an ALJ should not "cherry pick" GAF scores that are supportive of his ultimate conclusion, while omitting ones that are not supportive. *McLaughlin v. Astrue*, CIV.A. 12-893, 2013 WL 309985, at *14 (W.D. Pa. Jan. 25, 2013). But "[a] GAF score does not have a direct correlation to the severity requirements of the Social Security mental disorder listings," so even "a GAF score of 45, if credited, would not require a finding of disability." *Gilroy v. Astrue*, 351 F. App'x 714, 715 (3d Cir. 2009). Accordingly, the failure to "make explicit reference" to a low GAF score does not automatically require remand, especially whenever the ALJ otherwise conducts a thorough analysis of all of the medical evidence in the record relative to a claimant's alleged mental health impairments. *Id.*; *see also Coy v. Astrue*, CIV.A. 08-1372, 2009 WL 2043491, at *14 (W.D. Pa. July 8, 2009) ("While it is perhaps unfortunate that the ALJ neglected to mention the GAF scores with specificity in his written decision, the Court is unaware of any precedent establishing this as a requirement.").

Indeed, "the Court will not remand simply to insert the missing GAF score into the opinion." *McLaughlin*, 2013 WL 309985, at *13. Rather, the failure to discuss a claimant's GAF score will be viewed as "harmless error where a claimant has not explained how the GAF score would have itself satisfied the requirements for disability in light of potentially contradictory evidence on record." *Bracciodieta–Nelson v. Comm'r. of Soc. Sec.*, 782 F. Supp. 2d 152, 165 (W.D. Pa. 2011) (citing *Rios v. Astrue*, 2010 WL 3860458 at *8 (E.D. Pa. 2010), *aff'd*, 444 F.

App'x 532, 535 (3d Cir. 2011)).

Such is the case here. While the ALJ did not expressly acknowledge that Plaintiff had twice been assessed a GAF score of 45, he thoroughly considered and discussed all of the medical evidence in the record that supported and undermined Plaintiff's claim. This evidence was consistent with a finding that Plaintiff was somewhat limited in her abilities to work. On the other hand, as the ALJ explained, the evidence also clearly showed that Plaintiff could engage in a number of daily activities and care for herself, despite her claimed impairments. In addition, following Plaintiff brief hospitalization, the objective evidence showed that her condition had improved: her mental status examinations were within normal limits; her depression and anxiety were stable on medication; and her panic attacks were largely under control as well. She had also reunited with her boyfriend (recall that their breakup precipitated Plaintiff's October hospitalization). Meanwhile, the opinion evidence – including that of Plaintiff's longtime treating psychiatrist, Dr. Krivy – all indicated that Plaintiff was no more than moderately limited by her mental health impairments. Plaintiff herself even claimed to Dr. Last "that she would be able to return to the workplace if she had transportation on a regular basis." (R. 313). All of this evidence was more than enough for the ALJ to conclude that "once the claimant's life stressors settled down [her] symptoms improved greatly with treatment and [she] was not experiencing debilitating symptoms"[9] and thus she was not disabled. (R. 25). Giving express consideration to

---

9. Plaintiff takes issue with the ALJ's observation that her condition had "greatly improved with treatment." Pl.'s Br. at 14, ECF No. 9. However, she ignores that it was her own doctor at Washington Hospital who opined upon her discharge that her condition had "greatly improved" since her admission. (R. 287). Moreover, although Plaintiff contends that it was improper to rely on Dr. Last's conclusion that Plaintiff had no significant limitations, seeing as he also assessed her with a GAF score of 45, the Court disagrees. "Rather than rely on the unexplained numerical score assigned by [Dr. Last], the ALJ's ultimate finding of no disability was substantially supported by [Dr. Last's] narrative finding that [Plaintiff] had no significant mental impairments." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010).

Plaintiff's two GAF scores would not have changed that. Nevertheless, even though the ALJ did not expressly refer to Plaintiff's two GAF scores, he did account for Plaintiff's inability to interact with supervisors, co-workers, and the public in such a way that was fully consistent with the degree of impairment indicated by those GAF scores. *See Gilroy*, 351 F. App'x at 716 (holding that remand was not required where ALJ failed to cite GAF score of 45, but nonetheless concluded, as here, that the plaintiff's anxiety limited her ability interact with supervisors, co-workers, and the public).

V. **CONCLUSION**

It is undeniable that Plaintiff has a number of impairments, and this Court is sympathetic and aware of the challenges that she faces in seeking gainful employment. Under the applicable standard of review and the current state of the record, however, the Court must defer to the reasonable findings of the ALJ and his conclusion that Plaintiff is not disabled within the meaning of the Act. For these reasons, the Court will **GRANT** the Motion for Summary Judgment filed by the Commissioner and **DENY** the Motion for Summary Judgment filed by Plaintiff. An appropriate Order follows.

McVerry, J.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARY ELIZABETH HARRISON,<br>Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN,<br>ACTING COMMISSIONER OF<br>SOCIAL SECURITY,<br>Defendant. | )<br>)<br>)<br>) 2:14-cv-00719-TFM<br>)<br>)<br>)<br>)<br>)<br>) |

## ORDER

**AND NOW**, this 14th day of October, 2014, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED**, **ADJUDGED**, and **DECREED** that the Commissioner's motion for summary judgment (ECF No. 10) is **GRANTED**, and Plaintiff's motion for summary judgment (ECF No. 8) is **DENIED**. The Clerk of Court shall docket this case as **CLOSED**.

BY THE COURT:

s/ Terrence F. McVerry
Senior United States District Judge

cc: **Kenneth R. Hiller, Esq.**
Email: khiller@kennethhiller.com

**Colin Callahan, Esq.**
Email: colin.callahan@usdoj.gov